**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| KEVIN COTE, Derivatively on Behalf of READY CAPITAL CORPORATION, Greenville, R.I. 02828 | Case No. |
| *Plaintiff*, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| READY CAPITAL CORPORATION, 1251 Avenue of the Americas, 50th Floor New York, NY 10020 | JURY TRIAL DEMANDED |
| Serve on: THE CORPORATION TRUST INCORPORATED 2405 York Road, Suite 201 Lutherville Timonium, Maryland 21093-2264 | |
| and | |
| THOMAS E. CAPASSE c/o Ready Capital Corporation 1251 Avenue of the Americas, 50th Floor New York, NY 10020 | |
| and | |
| ANDREW AHLBORN c/o Ready Capital Corporation 1251 Avenue of the Americas, 50th Floor New York, NY 10020 | |
| and | |
| JACK J. ROSS c/o Ready Capital Corporation 1251 Avenue of the Americas, 50th Floor New York, NY 10020 | |
| and | |

MEREDITH MARSHALL
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor
New York, NY 10020

and

DOMINIQUE MIELLE
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor
New York, NY 10020

and

GILBERT NATHAN
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor
New York, NY 10020

and

J. MITCHELL REESE
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor
New York, NY 10020

and

TODD M. SINAI
c/o Ready Capital Corporation
1251 Avenue of the Americas, 50th Floor
New York, NY 10020

  *Defendants*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

  Plaintiff Kevin Cote ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Ready Capital Corporation ("Ready Capital" or

the "Company"), submits this Verified Shareholder Derivative Complaint against the Company's Board of Directors (the "Board") and certain of its executive officers, seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties, gross mismanagement, waste of corporate assets, abuse of control, unjust enrichment, and violations of federal law, including Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference calls transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ready Capital, legal filings, news reports, securities analysts' reports, and other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought on behalf of Ready Capital to remedy the Individual Defendants' violations of state and federal law that occurred between August 8, 2024 and March 2, 2025, both dates inclusive (the "Relevant Period"), and caused substantial harm to the Company.

2.     Ready Capital is a real estate finance company that originates, acquires, finances, and services lower-to-middle market ("LMM") commercial real estate ("CRE") loans, small business administration ("SBA") loans, residential mortgage loans, construction loans, and other real estate-related investments.

3.      On August 8, 2024, Ready Capital announced "improving credit metrics" with respect to the Company's loan portfolio in a press release discussing its second quarter 2024 results.

4.      Throughout the rest of the Relevant Period, the Individual Defendants touted the Company's financial success, representing that Ready Capital's credit metrics continued to improve and that several initiatives to derisk the Company's CRE portfolio had been successful.

5.      The truth emerged on March 3, 2025, when Ready Capital issued a press release announcing disappointing financial results for the fourth quarter and full year 2024. Specifically, the press release revealed a net loss of $1.80 per share in the fourth quarter of 2024 and a net loss of $2.52 per share for the full year of 2024. The press release further reported that the Company would take action to stabilize its balance sheet by fully reserving its non-performing loans in the CRE portfolio, including taking on approximately $284 million in combined Current Expected Credit Loss ("CECL") and valuation allowances for 2024 in order to mark the Company's non-performing loans to current values.

6.      On this news, the Company's stock price fell $1.86 per share, or approximately 26.8%, from a closing price of $6.93 per share on March 2, 2025 to a closing price of $5.07 per share on March 3, 2025, on unusually heavy trading volume.

7.      The Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact about the Company's business, operations, and prospects. Specifically, the Individual Defendants made and/or caused the Company to fail to disclose that, *inter alia*: (1) Ready Capital's CRE portfolio held significant non-performing loans that were not likely to be collectible; (2) Ready Capital's credit metrics were not stabilizing and its initiatives to derisk the

CRE portfolio were not successful; (3) the non-performing loans hindered Ready Capital's financial performance such that Ready Capital would have to fully reserve the non-performing loans to normalize its CRE portfolio; and (4) Ready Capital's actual expected credit loss or valuation allowances did not accurately reflect the impact of the non-performing loans. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

8. Further, as a direct and proximate result of the Individual Defendants' misconduct, while the price of the Ready Capital's common stock was artificially inflated due to the false and misleading statements, the Company repurchased its own common stock at prices that were artificially inflated, resulting in the Company overpaying for its own stock by approximately $13.7 million.

9. As a result of the Individual Defendants' misconduct, a consolidated securities fraud class action lawsuit is pending in the United States District Court for the Southern District of New York (the "Securities Class Action") against the Company, its Chief Executive Officer and Chief Investment Officer, and its Chief Financial Officer, styled as *In re Ready Capital Securities Litigation,* Case No. 1:25-cv-01883-PAE (S.D.N.Y). The Securities Class Action has exposed the Company to massive class-wide liability and costs related to defending itself in those actions.

10. In light of the Individual Defendants' breaches of fiduciary duties; the Company directors' collective engagement in fraud and misconduct; the substantial likelihood of the directors' liability in this derivative action; the officers' and directors' liability in the Securities Class Action; and of their not being disinterested and/or independent directors, a majority of Ready Capital's Board cannot consider a demand to commence litigation against themselves on behalf of Ready Capital with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act because Plaintiff's claims asserted raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

12.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this District because the alleged misstatements, omissions, and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions and activities have had an effect in this District.

**PARTIES**

16.    Plaintiff is a current shareholder of Ready Capital. Plaintiff has continuously held Ready Capital common stock at all relevant times.

17.    Ready Capital is a Maryland corporation with its principal executive offices at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020. Ready Capital's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RC."

18.    Defendant Thomas E. Capasse ("Capasse") has served as the Company's CEO ("CEO") and Chairman of the Board since October 2016 and as Chief Investment Officer ("CIO")

since November 2022. Defendant Capasse is also a co-founder and a manager of Waterfall Asset Management, LLC ("Waterfall"), the Company's external manager and advisor. Defendant Capasse is named as a defendant in the Securities Class Action.

19.     Defendant Andrew Ahlborn ("Ahlborn") has served as the Company's Chief Financial Officer ("CFO") since March 2019. From 2015 to 2019, Defendant Ahlborn served as Controller of the Company. Defendant Ahlborn also joined Waterfall in 2010. Defendant Ahlborn is named as a defendant in the Securities Class Action.

20.     Defendant Jack J. Ross ("Ross") has served as President and a Company director since October 2016. Defendant Ross is also a co-founder and manager of Waterfall.

21.     Defendant Meredith Marshall ("Marshall") has served as a Company director since December 2022. Defendant Marshall also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

22.     Defendant Dominique Mielle ("Mielle") has served as a Company director since March 2021. Defendant Mielle also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

23.     Defendant Gilbert Nathan ("Nathan") has served as a Company director since March 2019. Defendant Nathan also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

24.     Defendant J. Mitchell Reese ("Reese") has served as a Company director since October 2016 and as Lead Independent Director since April 2025. Defendant Reese also serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

25.     Defendant Todd M. Sinai ("Sinai") has served as a Company director since October

7

2016. Defendant Sinai also serves as the Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

26.     By reason of their positions as officers, directors, and/or fiduciaries of Ready Capital and because of their ability to control the business and corporate affairs of Ready Capital, the Individual Defendants owed Ready Capital and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ready Capital in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ready Capital and its shareholders.

27.     Each director and officer of the Company owes to Ready Capital and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ready Capital, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of Ready Capital were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

30.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ready Capital, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Ready Capital's Board at all relevant times.

31.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

32.    To discharge their duties, the officers and directors of Ready Capital were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ready Capital were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, New York, and the United States, and pursuant to Ready Capital's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Ready Capital conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Ready Capital and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ready Capital's operations would comply with all applicable laws and Ready Capital's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

10

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.     Each of the Individual Defendants further owed to Ready Capital and the shareholders the duty of loyalty requiring that each favor Ready Capital's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ready Capital and were, at all times, acting within the course and scope of such agency.

35.     Because of their advisory, executive, managerial, directorial, and controlling positions with Ready Capital, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

36.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ready Capital.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ready Capital was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ready Capital and was at all times acting within the course and scope of such agency.

### READY CAPITAL'S CODE OF BUSINESS CONDUCT AND ETHICS

42. Ready Capital's Code of Business Conduct and Ethics (the "Code of Ethics") applies to ". . . all officers, directors and employees of the Company and its subsidiaries and officers, directors and employees of Waterfall Asset Management, LLC ('Waterfall'), the Company's external manager . . ."

43. Additionally, the Code of Ethics states that Ready Capital may ". . . on a case-by-case basis, determine to treat certain affiliates or non-employees (e.g., consultants or service providers)" as "Covered Persons" for purposes of the Code of Ethics.

44. The Code of Ethics states that Covered Persons must adhere to the following conduct:

- Place the Company's interests ahead of their own – Covered Persons must serve in the Company's best interests and avoid inappropriately benefiting at the expense of the Company.

- Engage in personal investing that is in full compliance with this Code – Covered Persons must review and abide by the Company's Personal Security Transaction Policy contained herein.

- Avoid taking advantage of your position – Covered Persons must not accept investment opportunities, gifts or other gratuities from individuals seeking to conduct business with the Company or Waterfall, or on behalf of an advisory client of Waterfall, unless in compliance with the Gifts and Entertainment Policy contained herein.

- Maintain full compliance with the Federal Securities Laws – Covered Persons must abide by the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Advisers Act, the Investment Company Act, and other Federal Securities Laws, as pertinent.

45. In a section titled "Compliance with Applicable Laws," the Code of Ethics states:

The Company is committed to conducting its business in strict compliance with all applicable governmental, state and local laws, rules and regulations, including, laws, rules and regulations related to securities, labor, employment and workplace safety matters. As a public reporting company with its stock trading on the New York Stock Exchange (the "NYSE"), the Company is also subject to regulation by the SEC and to the applicable listing standards of the NYSE. All Covered Persons are expected at all times to conduct their activities on behalf of the Company in

13

accordance with this principle. Any violation of applicable laws, rules and regulations by any Covered Person should be reported to the Chief Compliance Officer. In addition to reporting such violations in accordance with the procedures set forth in this Code, Covered Persons may also report any potential suspected violations of law or regulations governing the Company's operations in accordance with the procedures set forth in the Company's "Whistleblowing Procedures" policy. Covered Persons should seek guidance whenever they are in doubt as to the applicability of any law, rule or regulation or regarding any contemplated course of action.

46.     In a section titled "Guiding Principles & Standards of Conduct," the Code of Ethics

states:

All Covered Persons will act with competence, dignity and integrity, in an ethical manner, when dealing with the public, prospects, third-party service providers and each other. The following set of principles frame the professional and ethical conduct that the Company expects from its Covered Persons:

- Act with integrity, competence, diligence, respect, and in an ethical manner with the public, service providers, third parties and other Covered Persons;

- Place the integrity of the Company and the interests of the Company above one's own personal interests;

- Adhere to the fundamental standard that you should not take inappropriate advantage of your position;

- Avoid any actual or potential material conflict of interest;

- Conduct all personal securities transactions in a manner consistent with this policy;

- Use reasonable care and exercise independent professional judgment when conducting investment analysis, making investment recommendations, taking investment actions, and engaging in other professional activities;

- Practice and encourage others to practice in a professional and ethical manner that will reflect favorably on you and the Company;

- Promote the integrity of, and uphold the rules governing, the Company's business;

- Maintain and improve your professional competence and strive to maintain and improve the competence of other investment professionals; and

14

- Comply with applicable provisions of the U.S. securities laws.

  The Company considers it be a violation of this Code for any Covered Person, directly or indirectly, to:

- Employ any device, scheme, or artifice to defraud the Company;

- Make any untrue statement of material fact to the Company or omit to state a material fact necessary in order to make the statements to the Company, in light of the circumstances under which they are made, not misleading;

- Engage in any act, practice or course of business that operates or would operate as a fraud of deceit on the Company; or
- Engage in any manipulative practice with respect to the Company

47.    In a section titled "Diversion of Company Business or Investment Opportunity,"

the Code of Ethics states:

Covered Persons must exercise great care any time their personal interests might conflict with those of the Company. The appearance of a conflict often can be as damaging as an actual conflict. Prompt and full disclosure is always the correct first step towards identifying and resolving any potential conflict of interest. Directors of the Company are expected to make appropriate disclosures to the Board and to take appropriate steps to recuse themselves from Board decisions with respect to transactions or other matters involving the Company as to which they are interested parties or with respect to which a real or apparent conflict of interest exists.

No Covered Person may acquire, or receive personal gain or profit from, any business opportunity that comes to his or her attention as a result of his or her association with the Company and in which he or she knows the Company might be expected to participate or have an interest, without disclosing in writing all necessary facts to the Chief Compliance Officer, offering the particular opportunity to the Company, and obtaining written authorization to participate from the Chief Compliance Officer.

Any personal or family interest of a Covered Person in any Company business activity or transaction of the Company must be immediately disclosed to the Chief Compliance Officer. For example, if a Covered Person becomes aware that a transaction being considered or undertaken by the Company may benefit, either directly or indirectly, a Covered Person or an immediate family member thereof, the Covered Person must immediately disclose this possibility to the Chief Compliance Officer.

15

48.     In a section titled "Protection of the Company's Name," the Code of Ethics states:

Covered Persons should at all times be aware that the Company's name, reputation and credibility are valuable assets and must be safeguarded from any potential misuse. Care should be exercised to avoid the unauthorized use of the Company's name in any manner that could be misinterpreted to indicate a relationship between the Company and any other entity or activity.

49.     In a section titled "Dealings with Stockholders," the Code of Ethics states the following:

The Company shall respect the rights of the Company's stockholders, including the right to obtain adequate access to information which the Company is required by law to disclose. Disclosure about the Company's affairs, operations and financial condition shall be made in accordance with the Public Disclosure section of this Code.

50.     In a section titled "Accounting Matters," the Code of Ethics states:

*Internal Accounting Controls*

The Company places the highest priority on "best practices" disclosure. The Company's annual reports, quarterly reports and press releases, and other public disclosure of the Company's financial results, reflect how seriously it takes this responsibility.

Covered Persons share this responsibility with the Company and the Board and must help maintain the integrity of the Company's financial records. The Company trusts that Covered Persons understand that protecting the integrity of its information gathering, information quality, internal control systems and public disclosures is one of the highest priorities it has as a firm.

Any Covered Persons who observes conduct that causes them to question the integrity of the Company's internal accounting controls and/or disclosure, or if they otherwise have reason to doubt the accuracy of Company's financial reporting, it is imperative that such concerns are brought to the Company's attention immediately. In accordance with the Company's "Whistleblowing Procedures" policy, Covered Persons should promptly report any concerns via the Company's Compliance Hotline, the Company's Compliance e-mail or to any member of the Audit Committee of the Board. If any Covered Person is not comfortable providing their name, they may report anonymously. Any kind of retaliation against Covered Persons for raising these issues is strictly prohibited and will not be tolerated.

*Improper Influence on the Conduct of Audits*

It is unlawful for Covered Persons, or any other person acting under the direction of any such persons, to take any action to fraudulently influence, coerce, manipulate, or mislead the independent accountants engaged in the performance of an audit of the Company's financial statements for the purpose of rendering such financial statements materially misleading. Any such action is a violation of this Code. Any Covered Persons who engages in such conduct will be subject to sanctions under this Code, in addition to potential civil and criminal liability. In accordance with the Company's "Whistleblowing Procedures" policy, Covered Persons should promptly report any concerns via the Company's Compliance Hotline, the Company's Compliance e-mail or to any member of the Audit Committee of the Board.

51.     In a section titled "Reporting Violations and Remedial Actions," the Code of Ethics

states, in relevant part:

The Company takes the potential for conflicts of interest and other potential violations of this Code very seriously. As such, the Company requires its Covered Persons to promptly report any violations of this Code to the Chief Compliance Officer. The Chief Compliance Officer shall promptly provide a summary of any reported Code violations to the Audit Committee of the Board. Alternatively, Covered Persons may promptly report any violations of this Code in accordance with the procedures set forth in the Company's "Whistleblowing Procedures" policy.

If any violation of the Company's Personal Security Transaction Policy is determined to have occurred, the Chief Compliance Officer may impose sanctions and take such other actions, including, without limitation, requiring that the trades in question be reversed, requiring the disgorgement of profits or gifts, issuing a letter of caution or warning, issuing a suspension of personal trading rights or suspension of employment (with or without compensation), imposing a fine, making a civil referral to the SEC, making a criminal referral, and/or terminating employment for cause or any combination of the foregoing. All sanctions and other actions taken shall be in accordance with applicable employment laws and regulations. Any profits or gifts forfeited shall be paid to the Company, the applicable client(s) of Waterfall, if any, or given to a charity, as the Chief Compliance Officer shall determine is appropriate.

No Covered Person shall participate in a determination of whether he or she has committed a violation of this Code or in the imposition of any sanction against himself or herself.

Nothing in this policy prohibits employees from reporting possible violations of federal law or regulation to any government official or agency, or reporting on other matters that are protected under the whistleblower provisions of federal law or regulation. Employees do not need prior authorization from the Company to make

17

a report to a government official or agency and are not required to notify the Company upon making any such report.

The Company will not seek to hold an employee liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law, or that is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. An individual who files a lawsuit for retaliation by the Company for reporting a suspected violation of law may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

52.     In a section titled "Public Disclosure," the Code of Ethics states:

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf. In meeting such standards for disclosure, the Company's officers and directors shall at all times strive to comply with the Company's disclosure obligations and, as necessary, appropriately consider and balance the need or desirability for confidentiality with respect to non-public negotiations or other business developments.

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing effective disclosure controls and procedures and internal control over financial reporting within the meaning of applicable SEC rules and regulations. The Company expects the Chief Executive Officer and the Chief Financial Officer to take a leadership role in implementing such controls and procedures and to position the Company to comply fully with its disclosure obligations within the timeframe required under applicable SEC rules and regulations. No Covered Person should interfere with, hinder or obstruct the Company's efforts to meeting the standards for public disclosure set forth above.

The Company's Chief Executive Officer and Chief Financial Officer are the Company's principal spokespersons. If someone outside the Company asks you questions or requests information regarding the Company, its business or financial results, do not attempt to answer. All requests for information - from reporters, securities analysts, stockholders or the general public - should be referred to either of these spokespersons, who will handle the request or delegate it to an appropriate person

53.     In a section titled "Books and Records," the Code of Ethics states:

The Company's responsibilities to its stockholders and the investing public require

18

that all of the Company's books, records, accounts and financial statements be maintained in reasonable detail, appropriately reflect the Company's transactions and conform to applicable legal requirements, the Company's system of internal controls and accounting principles generally accepted in the United States ("GAAP"). The Company relies on the accuracy and completeness of its business records to (i) provide full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf, (ii) make management decisions and (iii) analyze its operations. The accuracy of such records is essential for continued, long-term business success.

No false, misleading or artificial entries may be made by any Covered Person in the books and records of the Company. All Covered Persons with supervisory responsibility shall establish and implement appropriate internal accounting controls over all areas of their responsibility to ensure the safeguarding of the Company's assets and the accuracy of its financial records and reports. The Company has adopted controls in accordance with internal needs and the requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All Covered Persons, within their areas of responsibility, are expected to adhere to these procedures, as directed by the Chief Financial Officer.

Any accounting adjustments that materially depart from GAAP must be approved by the Company's Chief Financial Officer. In addition, all material off-balance-sheet transactions, arrangements and obligations, contingent or otherwise, and other relationships of the Company with unconsolidated entities or other persons that may have material current or future effects on the financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses must be disclosed to the Company's Chief Financial Officer.

54.    In a section titled "Waivers," the Code of Ethics states:

Any waiver of this Code for executive officers or directors of the Company may be made only by the Board, or by a committee of the Board specifically authorized for this purpose, and must be promptly disclosed to the Company's stockholders as required by law or regulation of the SEC and the rules of the NYSE. Waivers of this Code for Covered Persons other than executive officers or directors of the Company may be made by the Chief Executive Officer or President of the Company, but only upon such Covered Persons making full disclosure in advance of the transaction in question. The Company shall maintain a record of any waivers granted to Covered Persons other than executive officers or directors of the Company and a summary of such waivers shall promptly be provided to the Audit Committee of the Board. This Code may be amended or modified at any time by the Board.

19

## READY CAPITAL'S AUDIT COMMITTEE CHARTER

55.      Ready Capital's charter for the Audit Committee (the "Audit Committee Charter")

states the following with respect to the purpose of the Audit Committee:

The principal purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Ready Capital Corporation (formerly known as Sutherland Asset Management Corporation) (the "Company") in fulfilling its responsibilities to the stockholders, potential stockholders and investment community relating to the corporate accounting and reporting practices of the Company and its subsidiaries, the quality and integrity of the Company's consolidated financial statements, the Company's compliance with applicable legal and regulatory requirements, the performance, qualifications and independence of the Company's external auditors, and the performance of the Company's internal audit function, controls and procedures.

In discharging its oversight role, the Committee is granted the authority to adopt policies and procedures to ensure that the accounting and reporting practices of the Company are of the highest quality and integrity, including the authority to investigate any matter brought to its attention, with full access to all books, records, facilities and personnel of the Company, and the authority to engage independent counsel and other advisers as it determines necessary to carry out its duties.

It shall also be the responsibility of the Committee to maintain free and open means of communication among the Board and the Company's external auditors, or internal auditors and personnel of the Company or its external manager, Waterfall Asset Management, LLC, a Delaware limited liability company (the "**Manager**"). Through these lines of communication, the Committee shall monitor any issues or areas that fall within the scope of its duties, purpose or responsibilities that require special attention.  The Company's external auditors are ultimately accountable to the Committee and the Board.

56.      In a section titled "Responsibilities and Duties," the Audit Committee Charter states

that the Audit Committee has the following responsibilities and duties, among others:

**A.      Financial and Related Reporting**

1.      Prior to the filing by the Company of a Quarterly Report on Form 10-Q (the "Form 10-Q"), the Committee shall approve such filing. In connection therewith, the Committee shall review with the Company's management and external auditors, the interim financial information to be included in the Form 10-Q and the matters described in the applicable standards, as such standards may be adopted and amended from time to time, of the Public Company Accounting Oversight Board (the "PCAOB").  In addition, in connection with the Committee's review of the

20

Form 10-Q when applicable, the Committee shall review any matters of significance, including significant adjustments, management judgments and accounting estimates, significant reserves and/or accruals, significant new accounting principles, disagreements between management and the external auditors and their effect, if any, on the Company's consolidated financial statements and recent or proposed applicable requirements of the SEC, the Financial Accounting Standards Board (the "FASB") or other similar governing bodies, and when applicable the disclosure set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-Q.

2.      The Committee shall, prior to each filing by the Company of an Annual Report on Form 10-K (the "Form 10-K") with the SEC, review with the Company's management and external auditors, and approve, the audited financial statements to be included in the Form 10-K and in the Company's annual report to stockholders (the "Annual Report"), review the form of audit opinion to be issued by the auditors on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and review and consider the matters described in the applicable standards, as such standards may be adopted and amended from time to time, of the PCAOB.  In connection therewith, the Committee shall review significant adjustments, management judgments and accounting estimates, significant reserves and/or accruals, significant new accounting principles, critical audit matters, disagreements between management and the external auditors and their effect, if any, on the Company's consolidated financial statements and recent or proposed applicable requirements of the SEC, the FASB or other similar governing bodies, and the disclosure set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-K.  Following such review, the Committee shall recommend to the Board whether the audited financial statements should be included in the Annual Report or the Form 10-K. Prior to the filing with the SEC of the Annual Report or the Form 10-K, the Board shall approve such filing.

3.      The Committee shall meet with the Company's Chief Executive Officer and/or any other officer of the Company responsible for certifying the Company's Form 10-K or Form 10-Qs filed with the SEC, prior to any such certification, and review with such officers their disclosures relating to (a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and the identification of any material weakness in internal controls and (b) any fraud, whether or not material, that involves the Company's management or other employees who have a significant role relating to the Company's internal controls.

4.      In connection with its review of each Form 10-Q and Form 10-K and prior to issuance of any earnings press release by the Company, the Committee shall review with the Company's management and external auditors the consolidated statements of operations, earnings guidance and other financial information to be included in such earnings press release. Prior to issuance of any release of financial

information or earnings guidance to analysts or rating agencies, the Committee shall review with the Company's management and external auditors the financial information or earnings guidance to be included in such release to be provided to analysts or rating agencies. Each member of the Committee shall have the opportunity to comment on such earnings press release, release of financial information or earnings guidance and/or arrange a conference call with the Company's management with respect to such release.

5.      The Committee shall annually issue a written report to the Board, a copy of which shall be included in the Company's proxy statement related to the annual meeting of stockholders, stating whether the Committee has (a) reviewed and discussed the audited financial statements with the Company's management, (b) discussed with the Company's external auditors the matters required to be discussed by the applicable standards adopted by the PCAOB and SEC, as such standards may be adopted and amended from time to time, (c) received from the Company's external auditors written disclosures and the letter regarding such auditors' independence required by applicable requirements of the PCAOB and discussed with such auditors their independence, (d) recommended to the Board that the audited financial statements of the Company be included in the Annual Report and the Form 10-K and (e) such other information as may be required, from time to time, by the rules and/or regulations of the NYSE, the SEC, the FASB or other similar governing bodies.

6.      The Committee shall periodically discuss with the Company's external auditors, such auditors' judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its consolidated financial statements. The discussion should include such issues as the clarity of the Company's financial disclosures, the degree of aggressiveness or conservatism of the Company's accounting principles and the  underlying estimates and other significant decisions made by the Company's management in preparing the financial disclosures.

7.      The Committee shall obtain and review, on an annual basis, a report prepared by the Company's management and/or external auditors setting forth all significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including an analysis of the effects on the financial statements of the Company of any alternative generally accepted accounting principle ("GAAP") methods adopted by the Company, any regulatory and/or accounting initiatives and any off-balance sheet structures and all critical accounting policies and practices the Company uses or expects to use.

**B.      Controls and Compliance**

1.      The Committee shall periodically review with the Company's management

and external auditors, and internal auditors of the Company or its Manager (a) the adequacy and effectiveness of the Company's system of internal accounting controls and procedures, (b) any recommendations of such external auditors and/or internal auditors of the Company or its Manager with respect to any material weaknesses in the Company's system of internal controls, (c) any material matters or problems with respect to accounting, records, procedures or operations of the Company which have not been resolved to such external and/or internal auditors' satisfaction after having been brought to the attention of management, (d) any material matters or problems with respect to the safeguarding of the Company's assets and limitations on authority of the Company's management relating to, among other things, investments, borrowings and derivative instruments, (e) any "management" or "internal control" letter issued, or proposed to be issued, by the Company's external auditors and all other material written communications between the external auditors and the management of the Company and (f) the work product for the testing of internal accounting controls and procedures. Such review should also consider the impact of the adequacy and effectiveness of the Company's system of internal accounting controls on the Company's financial reporting on both an annual and quarterly basis.

2.      The Committee shall discuss and review policies with respect to risk assessment and risk management, including, but not limited to, (a) guidelines and policies to govern the process by which risk assessment and risk management is undertaken by the Company and its management, (b) the adequacy of the Company's insurance coverage, (c) any uninsured or commercially uninsurable risks, (d) the Company's interest rate risk management, (e) the Company's counter-party and credit risks, (f) the Company's capital availability and refinancing risks and (g) the Company's information security program, including the management of risks relating to data security, cybersecurity and privacy.

3.      The Committee shall review with the Company's management and tax advisors the status of all tax returns, including open years and potential disputes. The Committee shall review with the Company's external auditors the adequacy of tax reserves included in the Company's consolidated financial statements.

4.      On at least an annual basis, the Committee shall review with legal counsel to the Company or its Manager, (a) any legal or regulatory matters that could have a significant impact on the Company's financial statements, (b) the Company's compliance with applicable laws and regulations and (c) inquiries received from regulators or governmental agencies.

5.      The Committee shall review the status of significant litigation with legal counsel to the Company or its Manager and external auditors, if appropriate, and whether reserves, if any, in connection with actual and/or potential litigation are appropriate.

6.      The Committee shall monitor and review the Company's compliance with

any applicable SEC and NYSE rules and regulations relating to, among other things, the Company's corporate accounting and reporting practices, the quality and integrity of the Company's consolidated financial statements, the performance, qualifications and independence of the Company's external auditors and the performance of the Company's internal audit function.

**C.    Internal Audit**

1.    To the extent applicable, the Committee shall review and approve the function of the internal audit department of the Company or its Manager, its staffing, compensation, budget, responsibilities, organization, activities, independence and authority of its reporting obligations, as well as the qualifications of its personnel. The Committee shall, on a regular basis, review the Company's internal audit charter, if any, and compliance by the Company's or the Manager's, as applicable, internal audit department with applicable standards of the Institute of Internal Auditors. The Committee shall also review the appointment, compensation and replacement of the Company's third-party internal auditors or, if applicable, senior internal auditing executive and the coordination of such activities with the Company's external auditors.

2.    The Company's third-party internal auditors, which may include the Manager, or, if applicable, the senior internal auditing executive shall report directly to the Committee. The Committee shall meet regularly, but in no event less than once every six months, with the internal auditors of the Company or its Manager in executive sessions without the Company's management present.

**D.    External Audit**

1.    The Committee shall engage and terminate (subject to, if applicable, stockholder ratification) the external auditors to be used to audit the consolidated financial statements of the Company.

2.    The Committee shall review and pre-approve the engagement fees and the terms of all auditing and non-auditing services to be provided by the Company's external auditors and evaluate the effect thereof on the independence of the external auditors. The Committee shall also review and evaluate the scope of all non-auditing services to be provided by the Company's external auditors in order to confirm that such services are permitted by any applicable rules and/or regulations of the NYSE, the SEC, FASB or other similar governing bodies. As necessary, the Committee shall consult with the Company's management regarding the engagement fees or terms of any such auditing or non-auditing services.

3.    The Committee shall, at least annually, evaluate the Company's external auditors' qualifications, performance and independence and present a written report to the Board of its conclusions with respect to such evaluation. In connection with this evaluation, the external auditors shall provide a written annual report to the

Committee describing: (a) such external auditors' internal quality control procedures; (b) any material issues raised by the most recent internal quality-control review, or peer review, of such external auditors or by any inquiry or investigation by government or professional authorities within the preceding five years, respecting one or more independent audits carried out by such external auditors, and any steps taken to deal with any such issues; and (c) in order to assess such external auditors' independence, all relationships between such external auditors and the Company. The Committee shall consult with the Company's management, its external auditors and/or personnel responsible for its internal audit function, as necessary, regarding this evaluation.

4.      The Committee shall review and evaluate the qualifications, performance and independence of the lead partner of the external auditors, ensure that neither the lead partner nor the concurring partner of the external auditors serves, respectively, in that capacity for more than five years (or such other period as may be prescribed by rules and/or regulations of the NYSE, the SEC, the FASB or other similar governing bodies) and present its conclusions with respect to the independent auditors, including whether the audit firm itself should be changed periodically, to the Board.

5.      The Committee shall meet with the Company's management and external auditors prior to commencement of the annual audit by such external auditors for the purpose of reviewing the scope and audit procedures of such audit, including special audit risk areas and materiality. The Committee shall also meet with the Company's external auditors subsequent to completion of that audit for the purpose of reviewing the results.

6.      The Committee shall obtain and review any written reports issued by the Company's external auditors regarding all critical accounting policies and practices the Company uses or expects to use, all alternative treatments of financial information within GAAP that have been discussed with the Company's management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the external auditors.

7.      The Committee shall meet regularly, but in no event less than once every six months, with the Company's external auditors in executive sessions without the Company's management present. Among the items to be discussed at these meetings are the auditors' evaluation of the Company's financial, accounting and the internal auditing personnel of the Company or its Manager, as applicable, and the cooperation that the auditors received during the course of the audit, including any audit problems or difficulties, together with the responses of the Company's management thereto, any restrictions on the scope of such external auditors' activities and any significant disagreements with the Company's management. If applicable, such review may also include any accounting adjustments that were noted or proposed by such auditors but were "passed" (including similar adjustments that were passed because individually they were not material), any

25

communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, any "management" or "internal control" letter issued, or proposed to be issued, by such auditors to the Company and all other material written communications between the external auditors and the management of the Company.

***

## E.    Other Committee Activities

1.    The Committee shall report to the Board on a regular basis.

2.    The Committee shall serve as access for the Company's management, external auditors and internal auditors to the Board with respect to all matters within the scope of the Committee's duties.

3.    In accordance with any applicable rules and/or regulations of the NYSE, the SEC, the FASB or other similar governing bodies, the Committee shall set clear policies for the Company's hiring of employees or former employees of the Company's external auditors. In addition, the Committee shall also conduct exit interviews with departing executive officers in order to evaluate the Company's corporate accounting and reporting practices.

4.    The Committee shall establish, review and update periodically an orientation and training program for new Committee members, based upon the New Member Orientation Guidelines attached hereto as Exhibit A, and ensure continuing education and training for current Committee members.

5.    The Committee shall conduct an annual evaluation of its own performance, including the performance of individual members, and confirm annually that all of the Committee's responsibilities set forth in this Charter have been performed.

6.    The Committee shall annually review and assess this Charter and recommend any proposed changes to the Board for approval. This Charter may be amended by the recommendation of the Committee and the approval of the independent members of the Board. All amendments will be reported to the Board.

7.    Members of the Committee shall assist the Chairperson's review and consideration of any related-party transactions presented to the Chairperson pursuant to the Company's related party transaction policies and procedures.

8.    The Committee shall periodically review the Company's "Code of Conduct and Ethics" and suggest any updates to the Board.

9.    The Committee shall oversee the Company's program to monitor compliance with the Company's "Code of Conduct and Ethics" and meet periodically with the Company's Chief Compliance Officer to discuss compliance

with the Code of Conduct and Ethics.

10.     When applicable the Committee shall review and retain a log of all matters reported to the Committee pursuant to the Company's "Whistleblowing Procedures" and "Code of Conduct and Ethics", which the Committee adopted in accordance with Section IV hereof.

11.     The Committee shall review and pre-approve any fees to be paid to any accounting advisors or consultants employed by the Company in connection with the Company's accounting, tax and auditing services.

## SUBSTANTIVE ALLEGATIONS

*Background*

57.     Ready Capital is a real estate finance company that originates, acquires, finances, and services a variety of real estate-related investments including, but not limited to, LMM CRE loans and small business administration loans.

58.     Ready Capital's loans are generally used by businesses to purchase real estate for use in their operations or by investors seeking to acquire a wide range of property types, including multi-family, office, retail, mixed use or warehouse properties.

59.     Ready Capital's LMM CRE and small business lending segments comprise approximately 87.9% and 12.1%, respectively, of its total loan portfolio.

60.     The Company's LMM CRE loans range in original principal amounts and are generally between $500,000 and $40 million.

61.     The Company originates LMM loans across the full life-cycle of an LMM property, including construction, bridge, stabilized and agency loan origination channels through its wholly-owned subsidiary, ReadyCap Commercial.

62.     In the fourth quarter of 2023, Ready Capital's Board approved a plan to strategically shift the Company's core focus to LMM CRE loans and government backed small business loans.

27

*Materially False and Misleading Statements*

63.     In the aftermarket hours of August 7, 2024, the day prior to the start of the Relevant Period, Ready Capital issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Press Release").

64.     The 2Q24 Press Release discussed the Company's second quarter financial results, including its purported "net book value of $12.97 per share," CECL reserve, and valuation allowance activity. In relevant part, the 2Q24 Press Release stated:

## Second Quarter Highlights
***
• *Net book value of $12.97 per share* of common stock as of June 30, 2024

***

The table below reconciles Net Income computed in accordance with U.S. GAAP to Distributable Earnings.

| (in thousands) | | Three Months Ended June 30, 2024 |
|---|---|---|
| **Net Loss** | $ | (34,201) |
| **Reconciling items:** | | |
| Unrealized loss on MSR - discontinued operations | | 7,219 |
| Unrealized gain on joint ventures | | (626) |
| Decrease in CECL reserve | | (24,574) |
| Increase in valuation allowance | | 80,987 |
| Non-recurring REO impairment | | 8,474 |
| Non-cash compensation | | 1,891 |
| Merger transaction costs and other non-recurring expenses | | 4,852 |
| Loss on bargain purchase | | 18,306 |
| Realized losses on sale of investments | | 22,355 |
| **Total reconciling items** | $ | 118,884 |
| Income tax adjustments | | (47,799) |
| **Distributable earnings before realized losses** | $ | 36,884 |
| Realized losses on sale of investments, net of tax | | (20,253) |
| **Distributable earnings** | | 16,631 |
| Less: Distributable earnings attributable to non-controlling interests | | 2,206 |
| Less: Income attributable to participating shares | | 2,301 |
| **Distributable earnings attributable to common stockholders** | $ | 12,124 |
| **Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted** | $ | 0.19 |
| **Distributable earnings per common share – basic and diluted** | $ | 0.07 |

65.     In the 2Q24 Press Release, Defendant Capasse stated that Ready Capital's financial results were "reflective of our cumulative efforts to cycle out of underperforming assets and into market yielding investments," and that "*[t]hese efforts, along with improving credit metrics across the loan portfolio* . . . position the Company to improve earnings moving into year end." [1]

---

[1] All emphasis added, unless otherwise noted.

66. Also in the aftermarket hours of August 7, 2024, Ready Capital published supplemental financial information about its second quarter financial results which discussed, among other things, the Company's alleged net book value as $12.97 per common share and "[t]otal leverage of 3.5x and recourse leverage ratio of 1.0x."

67. On August 8, 2024, the Company hosted an earnings call to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call").

68. During the 2Q24 Earnings Call, Defendant Capasse stated that Ready Capital had "***successfully executed several initiatives,***" including "active asset management" and "reallocation of low-yield assets" which "better position[ed] the company for earnings growth[.]"

69. Defendant Capasse further stated, during the 2Q24 Earnings Call, that "***all credit metrics across our $7.9 billion originated CRE loan book improved quarter-over-quarter.***"

70. Defendant Capasse likewise stated, on the 2Q24 Earnings Call, that Ready Capital's M&A portfolio, assets acquired in prior mergers and acquisitions, "totaled $1.1 billion across 81 assets ***with improving credit performance***."

71. During the 2Q24 Earnings Call, Defendant Capasse stated, with respect to the Company's "overall CRE portfolio," that Ready Capital's "***recent asset management activities has further derisked our portfolio***."

72. Defendant Capasse also stated, during the 2Q24 Earnings Call, that "***the recent rate rally is a green shoot***" for Ready Capital's business and that "***the tides are turning in the CRE cycle*** with green shoots in the form of rate declines, and in multifamily, peaking deliveries and improving transaction volume."

73. During the question-and-answer segment of the 2Q24 Earnings Call, an analyst asked: "[a]s you think about the different drivers of the earnings ramp, where is the biggest risk in

29

executing that strategy? . . . Is it credit issues in the existing portfolio?"

74.    In response, Defendant Capasse cited "negative migration" – a decline in credit qualify or performance of existing loans  – as the "big risk" in the Company's multifamily CRE loan book but assured that negative migration was "*a low risk*" because of the "underlying fundamentals," such as the level of demand and favorable renting costs versus buying costs since the Company is "in the affordable segment."

75.    On August 9, 2024, Ready Capital reported its financial results for the second quarter of 2024 in its quarterly report on Form 10-Q with the SEC (the "2Q24 10-Q").

76.    The 2Q24 10-Q included a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," which reported that Ready Capital's "allowance for credit losses" "*are reviewed quarterly considering credit quality indicators, including probable . . . losses[.]*"

77.    The 2Q24 10-Q further stated that the Company "*estimate[s] the CECL expected credit losses for our loan portfolio at the individual loan level*," which purportedly included "key loan-specific inputs" and "a macro-economic forecast."

78.    On November 7, 2024, Ready Capital issued a press release regarding its financial results for the third quarter of 2024 (the "3Q24 Press Release").

79.    The 3Q24 Press Release discussed the Company's third quarter financial results, including its purported "net book value of $12.97 per share," CECL reserve, and valuation allowance activity. Specifically, the 3Q24 Press Release stated, in relevant part:

**Third Quarter Highlights**

- Lower-to-Middle Market originations of $246 million

- Record Small Business Lending loan originations of $440 million, including $355 million of Small Business Administration 7(a) loans

- ***Net book value of $12.59 per share of common stock as of September 30, 2024***

- Declared and paid dividend of $0.25 per share

- Strengthened the Small Business Lending platform with the acquisition of Funding Circle USA, Inc.

| (in thousands) | | Three Months Ended September 30, 2024 |
|---|---|---|
| Net Loss | $ | (7,279) |
| Reconciling items: | | |
| Unrealized loss on joint ventures | | 2,173 |
| Increase in CECL reserve | | 52,442 |
| Decrease in valuation allowance | | (71,060) |
| Non-recurring REO impairment | | 525 |
| Non-cash compensation | | 1,916 |
| Merger transaction costs and other non-recurring expenses | | 4,070 |
| Bargain purchase gain | | (32,165) |
| Realized losses on sale of investments | | 109,675 |
| Total reconciling items | $ | 67,576 |
| Income tax adjustments | | (13,739) |
| Distributable earnings before realized losses | $ | 46,558 |
| Realized losses on sale of investments, net of tax | | (89,072) |
| Distributable earnings | $ | (42,514) |
| Less: Distributable earnings attributable to non-controlling interests | | 1,766 |
| Less: Income attributable to participating shares | | 2,241 |
| Distributable earnings attributable to common stockholders | $ | (46,521) |
| Distributable earnings before realized losses on investments, net of tax per common share - basic and diluted | $ | 0.25 |
| Distributable earnings per common share - basic and diluted | $ | (0.28) |

80. In the 3Q24 Press Release, Defendant Capasse was quoted as stating that the Company's "***third quarter performance demonstrates our diligent efforts to reposition underperforming loans into market yielding investments***," and that with "***an improving economic environment***," Ready Capital "continue[d] to make significant progress toward our long-term targets that are marked by higher levels of sustained returns."

81. Also on November 7, 2024, Ready Capital published supplemental financial information regarding its financial results for the third quarter of 2024, which discussed, among other things, the Company's alleged net book value as $12.59 per share and "[t]otal leverage of 3.3x and recourse leverage ratio of 1.0x."

82. On November 8, 2024, Ready Capital hosted an earnings call regarding its financial results for the third quarter of 2024 (the "3Q24 Earnings Call").

31

83.    During the 3Q24 Earnings Call, Defendant Capasse stated, during his prepared remarks, that Ready Capital's "***CRE portfolio is showing stabilizing credit metrics***" and that "[t]he rate of negative credit migration in the portfolio ***continues to stabilize***."

84.    Defendant Capasse continued, stating that the "growth earnings contribution" of the Company's Small Business Lending segment "along with ***normalization of our CRE business to historical levels should support a longer-term ROE premium to our peer group***."

85.    During the 3Q2024 Earnings Call, Defendant Capasse also shared that "***Ready Capital is well positioned to capitalize on the tailwinds in the CRE market***."

86.    Further, Defendant Capasse stated that Ready Capital's ***leverage position remains conservative***" as a "***total leverage of 3.3 times is below [the Company's] long-term target of four times***."

87.    Defendant Capasse also remarked, during the 3Q24 Earnings Call that "***Ready Capital is well positioned to capitalize on the tailwinds in the CRE market,***" noting that the Company's "***stabilizing CRE platform***" was one of the "***key drivers***" of its earnings growth.

88.    In response to an analyst asking, during the 3Q24 Earnings Call, asking whether Defendant Capasse's statements "were sort of you thinking that you're through [the Company's] worst of the commercial real-estate cycle?", Defendant Capasse stated:

> ***Yes***, ***we're definitively seeing*** as evidenced by Adam's comments in terms of the ***kind of sawtooth down in the absolute dollar delinquencies***, and what we're seeing in terms of the migration of the four or five assets as it relates to the originated portfolio, it definitely is mirroring the what you're seeing in terms of the macro data in the multi-family sector.

89.    On November 12, 2024, Ready Capital reported its financial results for the third quarter of 2024 in its quarterly report on Form 10-Q with the SEC (the "3Q24 10-Q").

90.    The 3Q24 10-Q described the Company's LMM CRE Segment Results, stating, in

relevant part:

**LMM Commercial Real Estate Segment Results.**

**Q3 2024 versus Q3 2023.** Interest income of $193.3 million represented a decrease of $26.2 million, primarily due to decreased loan balances, partially offset by increases in interest rates. Interest expense of $150.5 million represented a decrease of $18.5 million, driven by decreased debt balances, partially offset by increases in interest rates. Provision for loan losses of $49.2 million represented an increase of $63.7 million, primarily due to an increase in asset specific reserves. Non-interest loss of $19.1 million represented an increase of $50.5 million, primarily due to net realized losses on financial instruments and real estate owned, partially offset by a decrease in the valuation allowance related to the transfer of Loans, net to Loans, held for sale in the first half of 2024. Non-interest expense of $21.1 million represented a decrease of $8.6 million, due to a decrease in employee compensation and benefits and loan servicing expenses.

91.    The 3Q2024 10-Q included a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," which discussed the Company's "critical accounting estimates" and stated that the Company's "allowance for credit losses" "*are reviewed quarterly considering credit quality indicators, including probable . . . losses.*"

92.    The 3Q24 10-Q also stated that Ready Capital "*estimate[s] the CECL expected credit losses for our loan portfolio at the individual loan level,*" which purportedly included "key loan-specific inputs" and "a macro-economic forecast."

93.    Specifically, in relevant part, the 3Q24 10-Q stated:

**Critical Accounting Estimates** Our consolidated financial statements are prepared in accordance with GAAP, which requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. We believe that all of the decisions and assessments upon which our consolidated financial statements are based were reasonable at the time made, based upon information available to us at that time. The following discussion describes the critical accounting estimates that apply to our operations and require complex management judgment. This summary should be read in conjunction with our accounting policies and use of estimates included in "Notes to Consolidated Financial Statements, Note 3 – Summary of Significant Accounting Policies" included in Item 8, "Financial Statements and Supplementary Data," in the Company's Form 10-K.

**Allowance for credit losses** *The allowance for credit losses consists of the allowance for losses on loans and lending commitments accounted for at amortized cost. Such loans and lending commitments are reviewed quarterly considering credit quality indicators, including probable and historical losses, collateral values, LTV ratio and economic conditions.* The allowance for credit losses increases through provisions charged to earnings and reduced by charge-offs, net of recoveries.

We utilize loan loss forecasting models for estimating expected life-time credit losses, at the individual loan level, for its loan portfolio. The Current Expected Credit Loss ("CECL") forecasting methods used by the Company include (i) a probability of default and loss given default method using underlying third-party CMBS/CRE loan database with historical loan losses and (ii) probability weighted expected cash flow method, depending on the type of loan and the availability of relevant historical market loan loss data. We might use other acceptable alternative approaches in the future depending on, among other factors, the type of loan, underlying collateral, and availability of relevant historical market loan loss data.

*We estimate the CECL expected credit losses for our loan portfolio at the individual* loan level. Significant inputs to our forecasting methods include (i) key loan-specific inputs such as LTV, vintage year, loan-term, underlying property type, occupancy, geographic location, and others, and (ii) a macro-economic forecast. These estimates may change in future periods based on available future macroeconomic data and might result in a material change in our future estimates of expected credit losses for its loan portfolio.

94.    On November 25, 2024, Ready Capital published its November 2024 Investor Presentation (the "Investor Presentation").

95.    The Investor Presentation discussed the Company's purportedly strong market position and attributed its LMM CRE portfolio as a major contributing factor, as well as the Company's "[c]onservative approach to credit with a focus on high conviction sectors, superior markets, and strong sponsors."

96.    The Investor Presentation also noted its only "<5bps losses incurred on new originations since the company's start" and described the Company's "financial flexibility" including its "total leverage of 3.3x."

97.    The above statements made on behalf of Ready Capital were materially false and/or

34

misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made and/or caused the Company to fail to disclose that, *inter alia*: (1) Ready Capital's CRE portfolio held significant non-performing loans that were not likely to be collectible; (2) Ready Capital's credit metrics were not stabilizing and its initiatives to derisk the CRE portfolio were not successful; (3) the non-performing loans hindered Ready Capital's financial performance such that Ready Capital would have to fully reserve the non-performing loans to normalize its CRE portfolio; and (4) Ready Capital's actual expected credit loss or valuation allowances did not accurately reflect the impact of the non-performing loans. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

### The Truth Emerges

98.    On March 3, 2025, the truth emerged when, before the market opened, Ready Capital issued a press release regarding its fourth quarter and full year 2024 financial results (the "4Q24 Press Release").

99.    The 4Q24 Press Release revealed that the Company experienced a fourth quarter net loss of $1.80 per share and full year 2024 net loss of $2.52 per share.

100.    In the 4Q24 Press Release, Defendant Capasse recognized that 2024 had been a year of "mixed results" and acknowledged that "aggressive reserving on problem loans" and a "rightsizing of the dividend to current cash earnings" were needed to "accelerate the path to recovery."

101.    The 4Q24 Press Release quoted Defendant Capasse as stating that Ready Capital would need to take "***decisive actions to stabilize***" its "***balance sheet*** going forward ***by fully reserving for all of our non-performing loans in our CRE portfolio***."

102.    The actions referenced in the 4Q24 Press Release included taking approximately $382 million in reconciling items, including $284 million in combined CECL and valuation allowances for all of 2024, in order to mark the Company's non-performing loans to current values.

103.    These decisive actions diminished the Company's book value per share significantly, from $12.59 in the prior quarter to $10.61.

104.    Ready Capital further revealed that its total leverage increased to "3.8x" from the prior quarter's total leverage of "3.3x," and that it cut its dividend to $0.125 per share "to align with anticipated cash earnings."

105.    Specifically, the 4Q24 Press Release stated, in relevant part:

**READY CAPITAL CORPORATION REPORTS FOURTH QUARTER 2024 RESULTS AND DECLARES FIRST QUARTER 2025 DIVIDENDS**

-    GAAP LOSS PER COMMON SHARE FROM CONTINUING OPERATIONS OF $(1.80) -
- DISTRIBUTABLE LOSS PER COMMON SHARE OF $(0.03) -
-    DISTRIBUTABLE EARNINGS PER COMMON SHARE BEFORE REALIZED LOSSES OF $0.23 -
-    DISTRIBUTABLE RETURN ON AVERAGE STOCKHOLDERS' EQUITY BEFORE REALIZED LOSSES OF 7.1% -
-    DECLARED A QUARTERLY CASH DIVIDEND OF $0.125 PER SHARE OF COMMON STOCK AND OPERATING PARTNERSHIP UNIT FOR THE QUARTER ENDING MARCH 31, 2025 –

New York, New York, March 3, 2025 / Globe Newswire / – Ready Capital Corporation ("Ready Capital" or the "Company") (NYSE: RC), a multi-strategy real estate finance company that originates, acquires, finances, and services lower-to-middle-market ("LMM") investor and owner-occupied commercial real estate loans, today reported financial results for the quarter ended December 31, 2024 and declared dividends for the quarter ending March 31, 2025.

"The fourth quarter closes out a year of mixed results. On one hand, our Small Business Lending segment performed well, with significant origination growth reflecting the benefits of past investments. Meanwhile, our multi-family lending focused business faced challenges from higher rates, inflationary pressures, and lower rent growth," said Thomas Capasse, Ready Capital's Chairman and Chief Executive Officer. ***"Entering 2025, we have taken decisive actions to stabilize and better position our balance sheet going forward by fully reserving for all of our***

36

***non-performing loans in our CRE portfolio.*** While this reduces our book value per share in the short term, we believe it provides a path to recovery in our net interest margin through the accelerated resolution of our non-performing loans to generate liquidity for reinvestment in higher-yielding new originations. Additionally, we have adjusted our dividend to $0.125 per share to align with anticipated cash earnings to preserve capital for reinvestment and share repurchases with potential upward bias co-incident with the recovery in earnings. We believe these actions will enable the Company to resume growth in both book value per share and the dividend as we move forward."

**Fourth Quarter Highlights**

- LMM commercial real estate originations of $436 million

- Small Business Lending ("SBL") loan originations of $348 million, including $315 million of Small Business Administration 7(a) loans

- Book value of $10.61 per share of common stock as of December 31, 2024

- Entered into a definitive merger agreement to acquire United Development Funding IV, a real estate investment trust providing capital solutions to residential real estate developers and regional homebuilders

- Acquired approximately 5.8 million shares of the Company's common stock at an average price of $7.35 per share as part of stock repurchase program

- Issued $130 million in aggregate principal amount of 9.00% Senior Unsecured Notes due 2029

**Full Year Highlights**

- ***GAAP Loss per common share from continuing operations of $(2.52)***

- Distributable earnings per common share before realized losses of $0.97

- Distributable return on average stockholders' equity before realized losses of 7.5%

- Total LMM and SBL originations of $2.4 billion, including $1.1 billion of Small Business Administration 7(a) loans

- Sold $7.6 billion in mortgage servicing rights in connection with the disposition of its residential mortgage banking segment

- Completed the acquisitions of Madison One, a leading originator and

servicer of USDA and SBA guaranteed loan product, and Funding Circle USA, Inc., an online lending platform that originates and services small business loans

- Acquired approximately 10.3 million shares of the Company's common stock at an average price of $7.95 per share as part of stock repurchase program

106. On the same date, March 3, 2025, Ready Capital held an earnings call to discuss its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Call").

107. During 4Q24 Earnings Call, Defendant Capasse stated that Ready Capital has "undertaken … aggressive actions to reset the balance sheet and go-forward earnings profile, including "*a $284 million combined CECL and valuation allowances, which marks 100% of our non-performing loans to current values*."

108. On this news, the Company's stock price fell $1.86 per share, from a closing price of $6.93 per share on March 2, 2025 to a closing price of $5.07 per share on March 3, 2025, on unusually heavy trading volume.

### REPURCHASES DURING THE RELEVANT PERIOD

109. According to the Company's public filings, while the price of the Ready Capital's common stock was artificially inflated due to the false and misleading statements, the Individual Defendants caused the Company to repurchase approximately 6,129,950 shares of its own common stock between August 2024 and March 2025, spending approximately $44,845,997 and substantially damaging the Company.

110. On March 3, 2025, when the truth was revealed, the Company's stock was worth only $5.07 per share.

111. According to the 2024 10-K filed with the SEC on March 3, 2025, between December 1, 2024 and December 31, 2024, Ready Capital purchased 5,843,463 shares of its

common stock at an average price of $7.35 per share, totaling approximately $42,949,453.

112. According to the Form 10-Q filed with the SEC on May 3, 2025 (the "1Q25 10-Q"), between January 1, 2025 and January 31, 2025, the Company purchased 207 shares of its common stock at an average price of $6.62 per share, totaling approximately $1,370.

113. According to the 1Q25 10-Q, between February 1, 2025 and February 28, 2025, the Company purchased 286,280 shares of its common stock at an average price of $6.62 per share, totaling approximately $1,895,174.

114. Given that the price of Ready Capital common stock was $5.07 per share on March 3, 2025, when the truth emerged, the true value of the approximately 6,129,950 shares was roughly $31,079,167.

115. Accordingly, during the Relevant Period, the Individual Defendants caused the Company to overpay to repurchase its own common stock by approximately $13,766,830.

**DAMAGE TO READY CAPITAL**

116. As a direct and proximate result of the Individual Defendants' conduct, Ready Capital has lost and will continue to lose and expend significant sums of money.

117. Such expenditures include, but are not limited to, the legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action filed against the Company and Defendants Capasse and Ahlborn, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

118. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.    Such expenditures also include, but are not limited to, costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

120.    Such expenditures also include, but are not limited to, the over $13.7 million that the Company overpaid when it repurchases its own common stock at artificially inflated priced during the Relevant Period before the truth emerged.

121.    Such expenditures also include, but are not limited to, the significant compensation, benefits, and other payments paid to the Individual Defendants who breached their fiduciary duties to the Company.

122.    As a direct and proximate result of the Individual Defendants' conduct, Ready Capital has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and the Individual Defendants' misrepresentations and wrongdoing as alleged herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    Plaintiff brings this action derivatively in the right and for the benefit of Ready Capital to remedy injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ready Capital, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, and also brings claims for contribution under Sections 10(b) and 21D of the Exchange Act.

125.    Plaintiff is, and has been at all relevant times, a shareholder of Ready Capital.

Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

126.    Plaintiff will adequately and fairly represent the interests of Ready Capital in enforcing and prosecuting its rights, and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

127.    Ready Capital is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    A pre-suit demand on the Board is futile and, therefore, excused. At the time this action was filed, Ready Capital's Board consisted of Defendants Capasse, Ross, Marshall, Mielle, Nathan, Reese, and Sinai (the "Director-Defendants"). Plaintiff needs only to allege that a majority of the seven Director-Defendants on the Board at the time this action was filed, *i.e.* four, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

129.    Each of the Director-Defendants, because of their advisory, managerial, and directorial positions within the Company, had knowledge of material, non-public information regarding Ready Capital and were directly involved in the Company's operations at the highest levels. As such, the Director-Defendants are unable to objectively investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

130.    Each of the Director-Defendants faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. As such, the Director-Defendants are unable to objectively investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

131.   Each of the Director-Defendants, by virtue of their roles, were requite to, among other things: (i) ensure Ready Capital complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how Ready Capital conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. The Director-Defendants filed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

132.   Each of the Director-Defendants, in complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Ready Capital to issue materially false and misleading statements that were intended to make Ready Capital's CRE portfolio appear more profitable and stable to investors.

133.   Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated to the public and made available to shareholders, and are principal beneficiaries of the wrongdoing alleged herein and are therefore not disinterested parties.

134.   Each of the Director-Defendants caused the Company to repurchase its own stock at artificially inflated prices. As such, the Director-Defendants are unable to objectively investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.   Each of the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus

excused.

136.    Demand on Defendant Capasse is futile for the additional reasons that follow. Defendant Capasse has served as CEO and CIO of the Company and as Chairman of the Board since October 2016. Defendant Capasse receives his principal compensation from his employment with Ready Capital, making him a non-independent director, as the Company admits. Thus, Defendant Capasse cannot independently consider any demand to sue himself for breaching his fiduciary duties because that would expose him to liability and threaten his livelihood. As he receives substantial compensation from the Company, Defendant Capasse is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including himself. Thus, Defendant Capasse could not consider a demand adverse to the other Director Defendants on the Compensation Committee because they are responsible for his financial future. As CEO and a Company director, Defendant Capasse was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Capasse is a defendant in the Securities Class Action and thus is in a position of irreconcilable conflict in terms of the prosecution of this action. For these reasons, Defendant Capasse breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Demand on Defendant Ross is futile for the additional reasons that follow.

Defendant Ross has served as the Company's President and as a Company director since October 2016. Defendant Ross receives his principal occupation from his employment with Ready Capital, making him not independent, as the Company admits. Thus, Defendant Ross cannot independently consider any demand to sue himself for breaching his fiduciary duties because that would expose him to liability and threaten his livelihood. As he receives substantial compensation from the Company, Defendant Ross is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the President and Executive Officers, including himself. Thus, Defendant Ross could not consider a demand adverse to the other Director Defendants on the Compensation Committee because they are responsible for his financial future. As the trusted President and as a Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ross breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Demand on Defendant Marshall is futile for the additional reasons that follow. Defendant Marshall has served as a Company director since December 2022. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Marshall has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons,

44

Defendant Marshall breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

139. Demand on Defendant Mielle is futile for the additional reasons that follow. Defendant Mielle has served as a Company director since March 2021. During the Relevant Period, she served as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. She currently serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Mielle has received and continues to receive significant compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Mielle breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

140. Demand on Defendant Nathan is futile for the additional reasons that follow. Defendant Nathan has served as a Company director since March 2019. He serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Nathan has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Nathan breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand

upon him is futile and, therefore, excused.

141. Demand on Defendant Reese is futile for the additional reasons that follow. Defendant Reese has served as a Company director since October 2016 and as the Company's Lead Independent Director since April 2025. He also serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Reese has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Reese breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

142. Demand on Defendant Sinai is futile for the additional reasons that follow. Defendant Sinai has served as a Company director since October 2016. He serves as the Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Sinai has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sinai breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

143. Demand is further futile as to Defendants Capasse and Ross for the additional

reasons that follow. Defendants Capasse and Ross are co-founders and managers of Waterfall, the Company's external manager and advisor. Having created a company together, a company that manages Ready Capital, Defendants Capasse and Ross have developed a longstanding business relationship and could not objectively consider a demand to sue each other. For these reasons, Defendants Capasse and Ross are not independent or disinterested and demand upon them is futile, and therefore, excused.

144. Demand is further futile as to Defendants Reese and Sinai for the additional reasons that follow. Defendants Reese and Sinai both served on the board of directors of Sutherland Asset Management Corporation between November 2013 and October 2016. As such, Defendants Reese and Sinai have developed a longstanding business relationship and could not objectively consider a demand to sue one another. For these reasons, Defendants Reese and Sinai are not independent or disinterested and demand upon them is futile, and therefore, excused.

145. Demand is further futile as to Defendants Nathan and Reese (collectively, the "Audit Committee Defendants") because the Audit Committee Defendants served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, the Audit Committee Defendants failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. The Audit Committee Defendants violated the Audit Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the

Individual Defendants' violations of law. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

146. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, avoid conflicts of interest, ensure the Company's disclosures were accurate, ensure the Company complied with applicable laws, rules, and regulations, and promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached Ready Capital's Code of Ethics, are not disinterested, and demand is excused as to them.

147. Each of the Director-Defendants received payments, benefits, stocks options, and other compensation by virtue of their members on the Board and their control of the Company.

148. Ready Capital has and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible to attempt to recover for Ready Capital. Thus, any demand upon the Director-Defendants would be futile.

149. The Individual Defendants' conduct was based on bad faith and intentional, reckless, or disloyal misconduct and thus, could not have been the product of legitimate business judgment. As such, to the extent such a provision exists, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter.

150. The acts complained of herein constitute violations of fiduciary duties owed by Ready Capital's officers and directors, and these acts are incapable of ratification.

151. As a majority of the Director-Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot exercise independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds (monies belonging to the stockholders of Ready Capital). If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Ready Capital, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. Thus, demand on the Director-Defendants is futile and, therefore, excused. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Ready Capital to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    For all of these reasons, all of the Director-Defendants, and at least a majority, *i.e.* four, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

49

## CLAIM I

### *Against the Individual Defendants for Breach of Fiduciary Duties*

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of Ready Capital's business and affairs.

157. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

158. In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

159. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties and breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.

160. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ready Capital.

161. The Individual Defendants' conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The

Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

162. The Individual Defendants' actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163. Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make materially false and misleading statements about Ready Capital 's business, operations, and prospects. Specifically, the Individual Defendants made and/or caused the Company to fail to disclose that, *inter alia*: (1) Ready Capital's CRE portfolio held significant non-performing loans that were not likely to be collectible; (2) Ready Capital's credit metrics were not stabilizing and its initiatives to derisk the CRE portfolio were not successful; (3) the non-performing loans hindered Ready Capital's financial performance such that Ready Capital would have to fully reserve the non-performing loans to normalize its CRE portfolio; and (4) Ready Capital's actual expected credit loss or valuation allowances did not accurately reflect the impact of the non-performing loans. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at all relevant times.

164. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

165. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts, even though such facts were available to them.

166. As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Ready Capital has sustained and continues to sustain significant damages.

167.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM II

### *Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act*

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The Individual Defendants disseminated and/or approved public statements that failed to disclose the true facts regarding Ready Capitals business, operations, and prospects. As a result, the Individual Defendants' public statements were materially false and misleading at all relevant times and the price of the Company's shares was artificially inflated as a result.

171.    As members of Ready Capital's Board and senior management team, and based on their roles at the Company, each of the Individual Defendants acted with scienter in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

172.    The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

173.    The Individual Defendants directly participated in the management of the Company at the highest levels and were privy to confidential proprietary information concerning the

Company and its business, operations, financial statements, and financial condition. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and were aware, or recklessly disregarded that the statements were in violation of the federal securities laws.

174. The Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

175. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ready Capital not misleading.

176. The Individual Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding Ready Capital, their control over, and/or receipt and/or modification of Ready Capital's materially misleading statements and their associations with the Company which made them privy to confidential proprietary information concerning Ready Capital.

177. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Ready Capital, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

178.     Ready Capital is one of the largest victims of the unlawful scheme perpetrated against it by the Individual Defendants. With the price of its common stock artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares, damaging Ready Capital.

179.     By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder and are liable for any harm caused to the Company.

## CLAIM III

### *Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act*

180.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.     The Individual Defendants, by virtue of their positions with Ready Capital and their specific acts, acted as controlling persons of Ready Capital within the meaning of §20(a) of the Exchange Act. By virtue of their positions as officers and directors of the Company, the Individual Defendants had the authority, power, and influence to cause the Company to issue false and misleading statements and to repurchase Ready Capital stock at artificially inflated prices because of those materially false and misleading statements.

182.     The Individual Defendants exercised their authority, power, and influence to cause Ready Capital to engage in the illegal conduct and practices complained of herein.

183.     Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM IV

### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

184. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have encouraged, facilitated, and advanced their breaches of their fiduciary duties. The Individual Defendants have aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the wrongful conduct complained of herein.

186. Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## **CLAIM V**

### *Against the Individual Defendants for Unjust Enrichment*

187. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ready Capital.

189. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Ready Capital that was tied to the performance or artificially inflated valuation of Ready Capital or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

190. Plaintiff, as a shareholder and representative of Ready Capital, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their

fiduciary duties.

191.    Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM VI

### *Against the Individual Defendants for Abuse of Control*

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ready Capital, for which they are legally responsible.

194.    As a direct and proximate result of the Individual Defendants' abuse of control, Ready Capital has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM VII

### *Against the Individual Defendants for Gross Mismanagement*

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ready Capital in a manner consistent with the operations of a publicly-held corporation.

198.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ready Capital has sustained and will continue to sustain significant damages.

199.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

200.   Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM VIII

### *Against the Individual Defendants for Waste of Corporate Assets*

201.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.   The wrongful conduct alleged herein was continuous, connection, and on-going. It resulted in continuous, connected, and on-going harm to Ready Capital.

203.   As a results of the wrongdoing, the Company has and will continue to incur many millions of dollars of legal liability and/or costs to defend legal actions, including the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204.   In addition, the Individual Defendants wasted corporate assets by paying excessive compensation and bonuses to certain of its executive officers and awarding self-interested stock options to certain officers and directors.

205.   In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

206.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

207.   Plaintiff, on behalf of Ready Capital, has no adequate remedy at law.

## CLAIM IX

57

*Against Defendants Capasse and Ahlborn for Contribution Under Sections 10(b) and 21D of the Exchange Act*

208.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.     Ready Capital and Defendants Capasse and Ahlborn are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

210.     If and when Ready Capital is found liable in the Securities Class Action, the Company's liability will be in whole or in part due to Defendants Capasse's and Ahlborn's willful and/or reckless violations of their obligations as officers and/or directors of Ready Capital.

211.     Defendants Capasse and Ahlborn, because of their positions of control and authority as officers and/or directors of Ready Capital, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ready Capital, including the wrongful acts complained of herein and in the Securities Class Action.

212.     Accordingly, Defendants Capasse and Ahlborn are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

213.     As such, Ready Capital is entitled to receive all appropriate contribution or indemnification from Defendants Capasse and Ahlborn.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ready Capital, and

that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ready Capital;

(c)     Determining and awarding to Ready Capital the damages sustained as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ready Capital and the Individual Defendants to take all necessary actions to reform and improve Ready Capital's corporate governance and internal procedures to comply with applicable laws and to protect Ready Capital and its shareholders from a repeat of the damaging events described herein;

(e)     Awarding Ready Capital restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury trial.

Dated: July 24, 2025                                   **GOLDMAN & MINTON, P.C.**

By: /s/_____
Thomas J. Minton (D. Md. no. 03370)
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Ph: (410) 783-7575
Fax: (410) 783-1711
Email: tminton@charmcitylegal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff Kevin Cote*